******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STATE OF CONNECTICUT *v.* JULIE A. FERRAZZANO-MAZZA
## (AC 42481)

Bright, C. J., and Moll and Suarez, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of operating a motor vehicle while under the influence of intoxicating liquor or drugs as a third time offender, and, after a court trial, of the infraction of operating a motor vehicle without a license, the defendant appealed to this court. *Held*:

1. The defendant could not prevail on her claim that the trial court improperly excluded evidence that she had offered to take a blood test in lieu of a Breathalyzer test and gave the jury a limiting instruction that it could not consider her offer to take a blood test as relevant to any issue in the case:

a. There was no merit to the defendant's claim that the trial court improperly excluded evidence regarding her purported offer to take a blood test, as the state, during its direct examination of D, the state trooper who arrested and processed the defendant, elicited the very testimony that the defendant asserted was improperly excluded and the defendant, thereafter, did not attempt to question D about this or to offer any other evidence of her purported offer to take a blood test.

b. Even if this court assumed that the trial court's limiting instruction concerning the relevancy of the defendant's purported offer to take a blood test was improper, there was no reasonable possibility that the jury was misled: although the defendant correctly argued that evidence of an offer to take a blood test instead of a Breathalyzer test may be relevant to rebut the inference of guilt permitted under the applicable statute (§ 14-227a (e)) when a defendant refuses to take the specific chemical test chosen by a police officer, in this case, there was no evidence that the defendant offered to take a blood test, and, therefore, an instruction that the jury could consider the defendant's consent to a blood test would have confused the jury; moreover, the state presented overwhelming evidence of the defendant's guilt, independent of her refusal to take a Breathalyzer test.

2. The defendant's claim that the trial court improperly denied her request to charge the jury on field sobriety acts, which provided that the jurors should use their common experience to evaluate whether she had been impaired and that the words used by the state's witnesses to describe field sobriety tests do not indicate that such tests are scientific, was unavailing; there was no reasonable possibility that the jury was misled by that court's refusal to adopt the defendant's requested instruction, as the court's instruction to the jurors that they must consider all the evidence in light of reason, experience and common sense sufficiently conveyed the defendant's proposed instruction, and, in this context, the terms used by the state's witnesses were simply descriptive and did not automatically imply that the topic was scientific in nature.

Argued October 19, 2020—officially released January 26, 2021

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crime of operating a motor vehicle while under the influence of intoxicating liquor or drugs and with the infraction of operating a motor vehicle without a license, and, in the second part, with having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor or drugs, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, where the charge of operating a motor vehicle while under the influence of intoxicating liquor or drugs

was tried to the jury before *Newson, J.*; verdict of guilty; thereafter, the charge of operating a motor vehicle without a license was tried to the court, *Newson, J.*; finding of guilty; subsequently, the defendant was presented to the court, *Newson, J.*, on a conditional plea of nolo contendere to the second part of the information; judgment of guilty in accordance with the verdict, the finding and the plea, from which the defendant appealed to this court. *Affirmed.*

*Vishal K. Garg*, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *Anne F. Mahoney*, state's attorney, and *Bonnie R. Bentley* and *Brenda L. Hans*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

BRIGHT, C. J. The defendant, Julie A. Ferrazzano-Mazza, appeals from the judgment of conviction of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes § 14-227a (a), which was tried to a jury, and operating a motor vehicle without a license in violation of General Statutes § 14-36 (a), which was tried to the court. The defendant also pleaded nolo contendere to being a third time offender in violation of § 14-227a (g) (3). On appeal, the defendant claims that the court improperly (1) excluded evidence that she had offered to take a blood test in lieu of a Breathalyzer test and delivered to the jury a limiting instruction on the use of such evidence, and (2) denied her request to instruct the jury that field sobriety tests are not based on science. We affirm the judgment of the trial court.

The jury reasonably could have found the following relevant facts. On December 22, 2016, after leaving work in Vernon at approximately 7 p.m., a motorist, John LaBossiere, came upon the defendant's pickup truck, a 2014 silver Dodge Ram (truck), stopped in the middle of the road on Route 44 in or near Willington. As LaBossiere approached the truck, it sped off. LaBossiere continued behind the truck, driving through a few towns before reaching Pomfret. He witnessed the truck swerving from side to side, repeatedly going over the yellow line and across the white fog line, seemingly overcompensating for its movements. He also observed that the defendant, who was alone in the truck, was having difficulty maintaining the truck at a consistent speed. LaBossiere became concerned and telephoned 911 as he followed behind the truck. He provided the 911 dispatcher with a description of the truck, including the license plate number, as he followed behind it for several more miles. LaBossiere, thereafter, lost sight of the truck as it sped away.

Shortly thereafter, LaBossiere entered Killingly and, as he came upon the intersection of Route 101 and Maple Street, where the Four G's restaurant is located, he saw the truck in the parking lot of the restaurant, positioned at an odd angle rather than in a designated parking space. He noticed that the driver's side door of the truck was open, that the defendant was outside of the truck, and that she was staggering. LaBossiere proceeded to turn right onto Maple Street, and he went about his business.

Just after 8 p.m., Bruce Taylor, a sergeant with the state police, who had received a certificate from the police academy for having completed a forty hour course on identifying and addressing driving while intoxicated offenses, observed the defendant's truck, which then was stopped facing the median between Route 6 and South Main Street in Brooklyn, approxi-

mately three and one-quarter miles from the Four G's restaurant. The truck was blocking the connector in such a way that no vehicles could get by it, and neither its emergency flashers nor its headlights were illuminated. Initially, Taylor thought that the truck might have been involved in a motor vehicle accident. He activated the emergency lights of his police vehicle, and he approached the driver's side of the truck. The defendant exited the truck, and Taylor thought that she appeared to be unsteady on her feet. When Taylor approached her, he could smell alcohol on her breath, which was more pronounced when she spoke to him. Her "mannerisms . . . [were] sluggish . . . she was very slouched over, she spoke in . . . a thick tongue manner, [and] her eyes were glassy . . . ." She kept rambling and told Taylor that she had run out of gas and that a good Samaritan had gone to get some for her.[1]

Taylor requested the defendant's license, registration, and insurance card, which the defendant was unable to produce at that time,[2] and he removed the keys from the ignition of the truck. Taylor then called in the license plate number of the truck. He also requested backup from Trooper Jason Deojay, who, at that time, was working pursuant to a grant investigating driving while intoxicated cases, so that Deojay could perform the necessary testing of the defendant. Trooper Matthew Siart also arrived on the scene. Taylor asked Siart to stand near the truck because he did not want the defendant, who was then seated in the truck, to exit the truck and fall into traffic. When Deojay arrived, Taylor relayed relevant information to him, including his suspicion that the defendant was "under the influence."

Deojay, who was aware of LaBossiere's 911 call, noticed the defendant's truck parked "somewhat diagonal with the driver's side rear tire partially flat, nearly flat, some minor damage to the driver's side, and then the driver's side door was open with a female seated in the driver's seat." When he approached the defendant, he noticed that "she had glassy eyes, slightly . . . slurred speech, and the odor of the alcoholic beverage coming from her breath as she spoke." Deojay acknowledged that these were indicators of an impaired driver. Deojay asked the defendant from where she was coming and to where she was going, and she responded that she was coming from a restaurant and going to a gas station. He asked her if she had consumed any alcoholic beverages, and she said no. Deojay then asked the defendant to step away from the truck in order to perform some field sobriety tests. Deojay administered the horizontal gaze nystagmus test, the walk and turn test, and the one leg stand test.

As he administered each test, Deojay asked the defendant whether she had any medical conditions that could interfere with her performance, to which she responded in the negative.[3] When he administered the horizontal

gaze nystagmus test, Deojay noticed nystagmus, which is an involuntary movement of the eye, at three positions in each eye. Out of the six possible clues that indicate intoxication in this test, the defendant had all six. When administering the walk and turn test, the defendant swayed, did not follow directions, and had to stop in order to steady herself. Out of eight possible clues that indicate intoxication in this test, the defendant had five. Finally, when Deojay administered the one leg stand test, the defendant swayed and raised her arms in an attempt to maintain her balance. She also put down her foot more than three times in fewer than ten seconds. Deojay saw three out of a possible four clues of intoxication during that test. On the basis of the totality of the circumstances, including the defendant's performance on all three tests, her "glassy eyes, the slightly slurred speech, [and] the odor of the alcoholic beverage on her breath," Deojay determined that the defendant was intoxicated, and he placed her under arrest.

After arriving at the state police barracks, Deojay took the defendant to the processing room, where Trooper Donna Bimonte[4] searched her. A silent video recorded the events that took place in the processing room. At 8:40 p.m., Deojay, in the presence of Bimonte, advised the defendant of her rights by reading her a preprinted notice of rights form, which Deojay and the defendant then signed. Deojay then prepared a postarrest interview form, documenting the defendant's responses to various questions. In response to a question asking whether she was ill, the defendant stated that she had undergone surgery three days earlier, but she did not elaborate.[5] She also stated that she was not taking any medication. Deojay also read the implied consent advisory contained on the postarrest interview form and notified the defendant that he would be requesting that she submit to either a blood, Breathalyzer, or urine test, as determined by him, and that, if he requested that she take a blood test, she could refuse to submit to that test and, instead, could opt to take a Breathalyzer or urine test. Deojay afforded the defendant an opportunity to telephone an attorney or a family member, but the defendant did not attempt to contact anyone at that time. Deojay thereafter told the defendant that he wanted her to take a Breathalyzer test. The defendant refused. When he testified before the jury, Deojay had no recollection of whether the defendant had requested to take a blood test, and he stated that he had reviewed the video from the processing room and that the defendant had held up her arms. He was certain, however, that she had refused to take a Breathalyzer test.

Trooper Bimonte had remained in the processing room and was present when the defendant refused to take a Breathalyzer test, and Bimonte acknowledged this refusal on a computerized form. Bimonte also

observed that the defendant had a strong smell of alcohol coming from her person as she spoke and that she "was somewhat disheveled with makeup on her face and very fidgety as she sat talking, moved her legs a lot, used her hands a lot, just—and very, very talkative during the whole process . . . [exhibiting a] flight of ideas, rambling on about different subjects." In Bimonte's opinion, after "thirteen years of nursing . . . three years being a state trooper, working at detox programs, [and] working in the prison system," the defendant was "impaired." As Deojay was bringing the defendant to the lockup, the defendant changed her mind about making a telephone call, and Deojay brought her back into the processing room and, as the defendant held the receiver, he "dialed" the telephone numbers given to him by the defendant, but she was unsuccessful in reaching anyone.

The state charged the defendant with operating a motor vehicle while under the influence of intoxicating liquor or drugs, and the jury found her guilty of that charge. In a part B information, the state charged the defendant with being a third time offender, and the defendant pleaded nolo contendere to that charge. The state also charged the defendant with operating a motor vehicle without a license, and the court, after finding the defendant guilty, granted an unconditional discharge on that charge. The court sentenced the defendant to a term of three years incarceration, execution suspended after twenty-eight months, with three years of probation and 100 hours of community service on the charge of operating a motor vehicle while under the influence of intoxicating liquor as a third time offender. This appeal followed.

I

The defendant first raises an evidentiary claim that the court improperly excluded evidence that she had offered to take a blood test in lieu of a Breathalyzer test and improperly gave a limiting instruction to the jury that it could not consider the defendant's offer to take a blood test as relevant to any issue in the case.[6] The defendant argues that the evidence that she was willing to take a blood test "was relevant to two issues in the proceedings: (1) whether [she] had, in fact, refused to take a Breathalyzer test, and (2) whether [her] refusal to take a Breathalyzer test supported an inference that [she] had operated a motor vehicle while under the influence of alcohol." We conclude that the state, on direct examination of Deojay, elicited the very testimony that the defendant claims the court improperly excluded and that there is no reasonable possibility that the jury was misled by the court's limiting instruction.

The following additional facts inform our review. Prior to her trial, the defendant filed a motion in limine seeking to preclude evidence that she had refused to

submit to a Breathalyzer test following her arrest. The defendant argued that the evidence should be excluded because Deojay, before asking her to take the Breathalyzer test, had not afforded her an adequate opportunity to contact an attorney.[7] During Deojay's testimony at the hearing, he was asked to narrate the silent video that had captured what had occurred in the processing room when the defendant was arrested, which he did. He acknowledged that the defendant had made many gestures and movements on the video, but he could not recall what she was saying. Deojay testified that once he told the defendant that he had chosen to administer a Breathalyzer test, she stated that she would not take it. Deojay also stated that the defendant had informed him earlier, while in the police cruiser, that she would not take any test. Deojay also stated that the defendant had not offered to take a blood test.

Defense counsel asked Deojay what procedure he undertook when someone volunteered to take a different test. The state objected to the question on relevance grounds, and the court sustained the objection, noting that the sole issue raised by the defendant in her motion was whether Deojay had afforded her an adequate opportunity to consult with an attorney before she refused to take the Breathalyzer test. The court subsequently denied the motion in limine.

On the first day of the trial, the state requested that the court preclude defense counsel from asking Deojay whether the defendant had offered to take a blood test. The state argued that, because § 14-227a (e) authorizes a police officer to choose the specific test to administer and gives no choice to an arrestee when the officer chooses a Breathalyzer test, defense counsel should be precluded from asking whether the defendant had offered to take a blood test. Defense counsel argued that she had a right to inquire as to what had happened on the night of the defendant's arrest and that the question of whether the defendant had refused to submit to a test was a question in the case. The court stated that, because the statute does not give the defendant the right to choose which test to take, whether she offered to take a different test likely was irrelevant. Defense counsel argued, among other things, that the issue was relevant. The court, thereafter, ruled that defense counsel could ask Deojay whether the defendant had offered to take any other tests. The court explained that it would not allow "any argument made to the jury to the specifics of if she wasn't drunk, she wouldn't have offered to provide this other test . . . ." Defense counsel responded, "I understand that. I have no plan to make such an argument, Your Honor."

The next morning, the court indicated that it had reconsidered its prior ruling on whether defense counsel could ask Deojay whether he recalled the defendant asking to take a blood test. The court stated that defense

counsel could question Deojay on this topic out of the presence of the jury, and, depending on Deojay's answers, the court might permit such questioning before the jury.

Thereafter, during direct examination of Deojay by the state before the jury, and before defense counsel conducted any questioning of Deojay outside the presence of the jury, the following colloquy occurred:

"Q. Okay. And—and you mentioned, although it's entirely your choice, but there are two other ways that a blood alcohol concentration can be obtained: blood and urine?

"A. Yes.

"Q. Okay. And did the defendant indicate that she would submit to either of those tests?

"A. I don't remember. But since I had an opportunity to review the video, she raised her arms in this motion, so it's possible that [she] might [have] asked for a breath—a blood test, but I don't remember.

"Q. Okay. So you have no—no recollection of her asking for a blood test?

"A. No.

"Q. Okay. And—and have you, in your experience, had people when you've told them you—you are offering them to take a breath test offer to take a blood test instead?

"A. I have.

"Q. And what is your experience with that?

"A. There's a lot of factors that go [into it]. For a blood test to be achieved, I have to transport the person to the hospital where there's a nurse on—or phlebotomist who can draw blood. We are not allowed to.

"Q. Okay.

"A. So it takes a—a lot of time to—to go there, then you gotta have the availability of a nurse; if there's an emergency in the emergency room where they're attending to, then they're not available. And she also has the option at that point, the defendant, to refuse. And normally it's just a delaying tactic that they use to prevent—cause I—I have a two hour window and—to get the test in, so time is of the essence."

The court then excused the jury and questioned the state as to why it had inquired into an area to which it had objected and on which the court had ruled that such questioning would first be conducted outside the presence of the jury. The state told the court that, subsequent to its ruling, Deojay had informed the state that, after reviewing the silent video, although he was certain that the defendant had refused the Breathalyzer test, he no longer was certain that the defendant had not

offered to take a blood test. The state further explained that it had disclosed Deojay's change in recollection to the defense and that the state had decided to pursue the topic on direct examination, rather than wait for the defendant to do so during cross-examination.

The court responded: "I mean, you're into it now, so I—I don't know [how] we can take it back, but it's not really relevant for the jury. I mean, I'm giving [it] an instruction that says, the fact that there's some other test out there in the world is not relevant."

Defense counsel argued that Deojay's testimony was before the jury and that she should be able to argue that the defendant might have offered to take an alternative test. The court reiterated that it was going to instruct the jury that the defendant did not have the option to choose which test to take and that the question before the jury was whether the defendant had refused to take the Breathalyzer test that had been chosen by Deojay. Defense counsel told the court the defendant was not contesting the fact that she had refused to take a Breathalyzer test, and she explained: "I understand that, Your Honor, and I understand that Your Honor [is going to] give that instruction. That's pursuant to the standard criminal jury instructions. The—the point I'm raising is that there has just been testimony that there may have been an offer to take another test. I do intend to argue that fact to the jury. That it's now in evidence. . . . That's fair argument." The court responded: "We'll deal with it," and then reiterated that the statute does not give the defendant the right to choose the test but that the choice falls to the officer.

The court then recalled the jury and offered the following limiting instruction: "All right. Ladies and gentlemen, before we get started again, the court's [just going to] advise you, you heard some—just heard some testimony about the possibility that there may be some other test available other than the breath test and where and how and when those tests may be conducted. That was provided for background and informational purpose only.

"You will get an instruction at the end of the trial that in an operating under the influence case if there is a claim that there is a refusal to take a test, the jury's only consideration is whether or not the test that was offered by the police officer was refused by the defendant, not whether there was an offer to take some other test or whether there was an availability of some other test.

"So, in considering this evidence to the extent that it's relevant—and, again, the background and information is not—your only consideration will be when I instruct you at the end is whether or not the defendant, if you find, if you find, and that's your job, that there was in fact a refusal, whether or not the defendant

refused the test that the officer chose. So, I'll allow you to continue. But I'll reinstruct you at the end of the trial."

Later, still during its direct examination of Deojay, the state presented a copy of the silent video, which Deojay narrated for the jury. During one point in the video, Deojay stated that he had just advised the defendant of her right to contact an attorney and requested that she take a Breathalyzer test, which she refused. When defense counsel cross-examined Deojay, Deojay again stated that the defendant had refused to take a Breathalyzer test. Defense counsel did not attempt to ask Deojay any questions about whether the defendant had offered to take any other test.

During defense counsel's closing argument, she suggested that the jury should discount the defendant's refusal to take the Breathalyzer test because the jury could find that Deojay had not afforded the defendant a reasonable opportunity to contact an attorney before he asked her to take the test. Specifically, she argued: "Trooper Deojay told you this, he reads the line from the form, I'm now giving you a reasonable opportunity to contact an attorney. And he said there was a phone on the desk. She could have called whoever she wanted to. She could have called 411. 411 from a police station? To me, that's incredible. He never instructed her that she could dial 411; but he did testify that even if she dialed 411, she would have to know the name of the person that she was calling. Is that reasonable? Is that a reasonable opportunity to contact an attorney? Did she have a fair shot at that? That's for you to decide."

She further argued: "And we have the booking video, we have the recording of what actually transpired. . . . All throughout the booking process you see [the defendant] engaging in conversation with both Trooper Bimonte and Trooper Deojay. She's asking questions, she's engaged, she looks like she's gesturing. They can't tell you what she was saying; no one remembers anything, nothing.

"That's the evidence. That's the evidence that the state wants you to draw this conclusion that she must have been drinking. That's what explains her animated speech. That's what explains her refusal to take a test. There's a perfectly plausible other explanation for her decision not to take this breath test, if you decide that that was actually a legitimate refusal."

Defense counsel then argued: "The situation is she ran outta gas, she then was asked by a bunch of troopers to do a bunch of very awkward tests even though she's telling them the whole time, I just need to get to the gas station. It's just right around the corner. That's— that's it. It just died.

"She tells them, I've had surgery. I haven't had anything to drink. I'm just trying to get to the gas station. No, no, no, no more of that, just get into the instructional

position. I'm gonna do this eye test for you. I want you to walk in a straight line back and forth to me. I want you to stand on one leg. I want you to pat your head and rub your stomach. They didn't ask her to do that, but that's the impression that she's left with. So she complies, she does everything they ask.

"They ask her questions, she answers; they ask her to do things, she does [them]. At the end of the day, they arrest her anyway. They take her back to the station. You've seen the video. She's talking to them. She looks like she's pleading with them. They ask her to take another test, no. No. That's fair. Why would she continue to cooperate? Why would she? Where has it gotten her up until that point that night? Where had it gotten her? She had done everything they asked. They're asking one more thing of her. That's it. She's had enough. It's a righteous refusal, if you find that it actually happened that way."

After the parties had concluded their closing arguments, the trial court delivered its final charge to the jury. Regarding the defendant's refusal to take a Breathalyzer test, the court instructed: "In the present case, there was evidence of the defendant's refusal to submit to specifically a breath test. If you find that the defendant did refuse to submit to such test, you may make any inference that follows from that fact that you find reasonable.

"Under our law, in the circumstances of this case, the defendant is deemed to have given an implied consent to the taking of a breath test, urine test, or other test at the option of the police officer. Again, the selection of the type of test is for the officer to make. Here, there is evidence that the officer selected a breath test. The issue, then, is not whether the defendant refused any and all test[s], but whether she refused the selected test.

"The word 'refuse' is defined as showing or expressing unwillingness to do or comply with. Here, it means to show [or] express an unwillingness to do or comply with the directive of the officer to take a particular . . . test. Now whether the defendant refused the breath test remains a question of fact for you to decide. You also heard evidence about the possibility of other chemical tests being available in addition to the Breathalyzer test or that the defendant may have offered to take another type of test.

"As I have instructed you during the trial, the availability of some other test or the defendant's offer to take some other test is irrelevant and you shall not consider it. Your only relevant consideration in determining whether you believe there was a refusal is whether the officer requested the defendant to take a particular chemical test and whether the defendant refused to take that particular test."

A

We begin with the defendant's claim that the court improperly excluded evidence that she had offered to take a blood test in lieu of a Breathalyzer test. We conclude that the state, on direct examination of Deojay, elicited the testimony, which was equivocal, that the defendant claims the court improperly excluded and that the defendant, thereafter, neither attempted to question Deojay about this, nor offered any other evidence of her purported offer to take a blood test.

"Our standard of review for evidentiary claims is well settled. To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit [or to exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 181, 193 A.3d 1 (2018), cert. denied,      U.S.      , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

Before Deojay took the witness stand to testify, the court told defense counsel that she would have to question Deojay out of the presence of the jury about whether the defendant had offered to take a blood test and that the court would rule on the propriety of such questioning at that time. Unbeknownst to the court, the state, having just learned that Deojay no longer was certain that the defendant had not offered to take a blood test, disclosed this information to the defendant, and, during its direct examination of Deojay, questioned him about it. Although the court was not pleased about the manner in which such questioning had taken place in light of its earlier ruling that such questioning initially would have to take place out of the presence of the jury, it did not strike the testimony, but it did offer a limiting instruction to the jury, to which defense counsel offered no objection and specifically stated that such an instruction was part of the standard jury instructions.

After the state had opened the door to this issue, defense counsel, when she cross-examined Deojay, did not attempt to elicit additional testimony about this issue—either out of the presence of the jury, in accordance with the court's earlier ruling, or in its presence—and there is no indication in the record that the court prohibited her from doing so. As a matter of fact, when defense counsel told the court that she intended to argue this point to the jury, the court responded, "We'll deal with it . . . ." Defense counsel, however, did not raise this issue again, either through witness testimony or during closing argument. On the basis of the foregoing, we conclude that the defendant's claim that the court improperly excluded evidence regarding her purported offer to take a blood test is without merit.

B

We next consider whether the court improperly instructed the jury that it could not consider the possibility that the defendant may have offered to take a blood test as relevant to any issue in the case. The defendant argues that the instruction was improper because "[t]he evidence was relevant to two issues in the proceedings: (1) whether the defendant had, in fact, refused to take a Breathalyzer test, and (2) whether the defendant's refusal to take a Breathalyzer test supported an inference that the defendant had operated a motor vehicle while under the influence of alcohol." We conclude that, even if we were to assume some impropriety in the court's instruction, it is not reasonably possible that the jury was misled.

We begin with the well established standard of review governing the defendant's challenge to the court's jury instruction. "Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled . . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is reasonably possible for [improprieties] of constitutional dimension or reasonably probable for nonconstitutional [improprieties] that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Edwards*, 334 Conn. 688, 716–17, 224 A.3d 504 (2020).

"It is well established that when a challenge to a jury instruction is not of constitutional magnitude . . . the charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Seekins*, 123 Conn. App. 220, 227, 1 A.3d 1089, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010).

Section 14-227a (e) provides: "In any criminal prosecution for a violation of subsection (a) of this section, evidence that the defendant refused to submit to a blood, breath or urine test requested in accordance with section 14-227b[8] shall be admissible provided the requirements of subsection (b) of said section have been satisfied. If a case involving a violation of subsec-

tion (a) of this section is tried to a jury, the court shall instruct the jury as to any inference that may or may not be drawn from the defendant's refusal to submit to a blood, breath or urine test." (Footnote added.)

It is significant when a defendant refuses to take a Breathalyzer test as chosen by the officer. The trier of fact, "pursuant to § 14-227a (e), [may draw] an inference of guilt from this refusal. . . . Such an inference is statutorily valid and a factor to be considered in tandem with other evidence when deciding the issue of intoxication. See, e.g., *State* v. *Hall*, 110 Conn. App. 41, 56–57, 954 A.2d 213 (2008) (refusal of Breathalyzer test and failure of field sobriety tests amongst other factors sufficient to prove intoxication); *State* v. *Gordon*, [84 Conn. App. 519, 528, 854 A.2d 74] (same) [cert. denied, 271 Conn. 941, 861 A.2d 516 (2004)]." (Citation omitted.) *State* v. *Morelli*, 293 Conn. 147, 163 n.11, 976 A.2d 678 (2009).

The defendant argues that the court's instruction was improper in that the court told the jury that Deojay's testimony that the defendant's offer to take a blood test was to be used only for background and informational purposes and was not otherwise relevant. She argues that the issue of whether she had offered to take a blood test rather than the Breathalyzer test "was relevant because the jury could have found that the defendant's offer to take another test did *not* amount to a refusal, and that the officer had misinterpreted that offer as a refusal." (Emphasis in original.) Even if we assume that the court's instruction too narrowly confined the jury's use of the defendant's purported consent to a blood test, we conclude that there is no possibility that the jury was misled.

First and foremost, although the defendant repeatedly argues that there was testimony that the defendant offered to take a blood test, Deojay's testimony was that "it's possible that [she] might [have] asked for a breath—a blood test, but I don't remember." Deojay then confirmed that he had "no recollection of [the defendant] asking for a blood test," but he was certain that she had refused to take a Breathalyzer test. Bimonte, who was in the processing room with Deojay and the defendant, also acknowledged the defendant's refusal on a computerized form, and she testified that, although she did not recall the defendant's exact words, the defendant asserted "an adamant refusal" to take a Breathalyzer test. Although the defendant may be correct in arguing that evidence of an offer to take a blood test instead of a Breathalyzer test may be relevant, in some circumstances, to rebut the statutory inference permissible under § 14-227a (e) when a defendant refuses to take the specific chemical test chosen by the officer, the testimony of Deojay in the present case was so equivocal concerning the *possibility* that the defendant *may have* requested to take a blood test that

it could not serve such a purpose, even if one were permissible. In this case, there was no evidence that the defendant offered to take a blood test. Consequently, an instruction that the jury could consider the defendant's consent to a blood test, of which there was no evidence, only would have confused the jury.

Furthermore, evidence of the defendant's guilt, independent of her refusal to take a Breathalyzer test, was overwhelming. The jury had before it the testimony of LaBossiere, who had followed behind the defendant's truck for several miles as the truck weaved in and out of its lane of travel. The jury also had LaBossiere's testimony that he saw the defendant's truck parked in the parking lot of the Four G's restaurant at an odd angle with the defendant standing outside of the truck. Additionally, it had LaBossiere's 911 call. Moreover, the jury had the testimony of the state police troopers who had arrived on the scene when the defendant's truck purportedly had run out of gas and was blocking the roadway. Those troopers testified that the defendant smelled of alcohol. Taylor thought that the defendant had been unsteady on her feet. He testified that her "mannerisms . . . [were] sluggish . . . she was very slouched over, she spoke in . . . a thick tongue manner, [and] her eyes were glassy . . . ." When Taylor requested the defendant's license, registration, and insurance card, the defendant fumbled around in the truck but was unable to produce them. Taylor was so concerned that he removed the keys from the ignition of the truck, and he asked Siart to stand near the truck so that the defendant would not fall into traffic.

The jury also heard Deojay's testimony that the defendant "had glassy eyes, slightly . . . slurred speech, and the odor of the alcoholic beverage coming from her breath as she spoke." Deojay told the jury that he asked the defendant to perform several field sobriety tests, and, on the basis of the defendant's poor performance of those tests and her "glassy eyes, the slightly slurred speech, [and] odor of the alcoholic beverage on her breath," he determined that the defendant was intoxicated. Additionally, the jury heard the testimony of Bimonte, who, prior to becoming a trooper, had thirteen years of experience in the nursing field, as well as having worked in detoxification programs. Bimonte testified that she believed that the defendant was "impaired" and that she had observed that the defendant smelled of alcohol, that she was disheveled, very fidgety, and exhibited a "flight of ideas."

This was not a close case. There was considerable evidence before the jury that the defendant was operating her truck while under the influence of alcohol. Accordingly, we conclude that, even if the court's instruction on the relevancy of Deojay's equivocal statement that the defendant "might have" indicated that she would be willing to take a blood test had been

improper, it is not reasonably possible that the jury was misled.

## II

The defendant next claims that the court improperly denied her request to charge the jury on field sobriety acts. She argues that the evidence established that she had been required to perform field sobriety tests but that the court's failure to provide the jury with her requested charge left it without "any guidance as to how to use the tests to assess the defendant's guilt." We are not persuaded.

The defendant filed a request to charge on field sobriety acts, which provided: "In this case there has been testimony that the defendant was asked and did agree to perform certain acts, which are commonly called field sobriety acts. It is up to you to decide if those acts give any reliable indication of whether . . . the defendant's capacity to operate a motor vehicle was impaired to such a degree that the defendant no longer had the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence, under the same or similar circumstances or whether they have any rational connection to operating a motor vehicle safely. In judging the defendant's performance on those acts, you may consider the circumstances under which they were given, the defendant's physical condition, the defendant's state of mind, and other factors you deem relevant.

"You have heard testimony concerning certain movements known as field sobriety tests. You have also heard terms such as 'clues' in connection with that testimony.

"Words such as these are commonly used by the average person to describe unscientific topics. You should not believe that these terms indicate a sobriety evaluation is based on science. Rather, you should evaluate this evidence based only on your common experience." The court declined to give this instruction. The defendant claims this was reversible error. We are not persuaded.

"The framework used to evaluate a challenge to a jury instruction given by the trial court is well established. Our review of the defendant's claim requires that we examine the court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient

for the guidance of the jury . . . we will not view the instructions as improper. . . . [A]n error in instructions in a criminal case is reversible error when it is shown that it is . . . reasonably probable . . . that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Kelley*, 95 Conn. App. 423, 434–35, 896 A.2d 129, cert. denied, 279 Conn. 906, 901 A.2d 1227 (2006).

The defendant claims that the court erred in failing to employ her proposed jury instruction, which provided that the jury should use its common experience to evaluate whether the she was impaired and that the words used by the state's witnesses to describe field sobriety tests do not indicate that these tests are scientific in nature.[9]

In reviewing the defendant's claim, we are guided by this court's holdings in *Kelley*, in which nearly identical claims were raised. See id., 432–36. First, in the present case, as in *Kelley*, the defendant had claimed that the trial court had "failed to instruct the jury that it could use its common experiences in determining impairment . . . ." Id., 433. In *Kelley*, this court concluded that the trial court's instruction to the jury that it "must consider all the evidence in light of reason, experience, and common sense" sufficiently met the defendant's proposed instruction. (Internal quotation marks omitted.) Id., 435. In the present case, as in *Kelley*, the trial court also specifically instructed the jury that it "must consider all the evidence in light of reason, experience, and common sense."

Second, in *Kelley*, the defendant claimed, inter alia, that the state or witnesses should not have been permitted to use the words "tests, results, pass, fail and points" when discussing or testifying about the walk and turn test and the one leg stand test because those "words wrongly [implied] that the matters had scientific validity . . . ." (Internal quotation marks omitted.) *State* v. *Kelley*, supra, 95 Conn. App. 432. This court rejected that claim, holding that, "[a]lthough there may be situations when language imbues unscientific evidence with scientific significance, using testing language to describe field sobriety tests is not one of them. Words like tests, results, pass, fail and points are commonly used by the average person to describe unscientific topics. In this context, the language is nothing more than descriptive and does not automatically imply that the topic is scientific in nature." (Internal quotation marks omitted.) Id., 433. The holdings in *Kelley* are applicable to the present case. Accordingly, we conclude that there is no reasonable possibility that the jury was misled by the court's refusal to adopt the defendant's proposed instruction.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The good Samaritan about whom the defendant spoke did not return to the scene while the police were there.

[2] Although the defendant later provided her Rhode Island operator's

license to the state police, it was determined that her license was under suspension.

[3] The defendant stated that she had hip displacement but that it would not interfere with her performance.

[4] At the time of trial, Bimonte was known as Donna Sabourin.

[5] Joseph Lawrence Leclair, the defendant's live-in boyfriend, explained during his testimony that the defendant had undergone spinal injections three days earlier. The defendant elected not to testify.

[6] As an alternative argument, the defendant states that, if we conclude that she has not preserved this issue properly, then the claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as a constitutional claim because the court violated her right to present a defense and to confront witnesses against her. We conclude that this evidentiary issue was preserved and, further, that the claim is not of constitutional magnitude.

[7] The defendant has not raised on appeal any claim relating to the alleged deprivation of her opportunity to contact an attorney in connection with Deojay's request that she take a Breathalyzer test.

[8] General Statutes § 14-227b provides in relevant part: "(a) Any person who operates a motor vehicle in this state shall be deemed to have given such person's consent to a chemical analysis of such person's blood, breath or urine . . . .

"(b) If any such person, having been placed under arrest for a violation of section 14-227a or 14-227m or subdivision (1) or (2) of subsection (a) of section 14-227n, and thereafter, after being apprised of such person's constitutional rights, having been requested to submit to a blood, breath or urine test at the option of the police officer, having been afforded a reasonable opportunity to telephone an attorney prior to the performance of such test and having been informed that such person's license or nonresident operating privilege may be suspended in accordance with the provisions of this section if such person refuses to submit to such test, or if such person submits to such test and the results of such test indicate that such person has an elevated blood alcohol content, and that evidence of any such refusal shall be admissible in accordance with subsection (e) of section 14-227a and may be used against such person in any criminal prosecution, refuses to submit to the designated test, the test shall not be given; provided, if the person refuses or is unable to submit to a blood test, the police officer shall designate the breath or urine test as the test to be taken. The police officer shall make a notation upon the records of the police department that such officer informed the person that such person's license or nonresident operating privilege may be suspended if such person refused to submit to such test or if such person submitted to such test and the results of such test indicated that such person had an elevated blood alcohol content. . . ."

[9] We note that during defense counsel's cross-examination of Taylor, she specifically questioned him about field sobriety tests, including the training he had undergone. One of the questions she asked was: "And it's not just that these are tests that officers just go around doing on their own free will. These are scientifically based measures of whether someone's intoxicated, right?" Taylor responded: "That is correct." Defense counsel made no attempt, with this witness or any other witness, to further explore the scientific or unscientific nature of field sobriety tests, with the exception of the state's expert, Robert Lockwood, a forensic scientist with the state forensic laboratory, whom she questioned about the horizontal gaze nystagmus test, a test the defendant concedes is scientific.